IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KYENAN HARDEN MORALES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 21 C 4058 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| CITY OF CHICAGO; STEFANY SOLIS, ) | |
| Chicago Police Officer, Star No. 8246; ) | |
| and J. RIVERA, Chicago Police Officer, ) | |
| Star No. 14101, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

  This is a civil-rights action arising from plaintiff's arrest and subsequent detention and prosecution. Defendants' motion for summary judgment is granted in part and denied in part for the reasons explained below.

**MATERIAL FACTS**

  On November 21, 2019, Chicago police officers Stefany Solis and James Rivera[1] (the "Officers"), working as partners, were assigned to respond to a domestic-disturbance complaint on Hamlin Avenue. The Officers stopped at the street curb and spoke to a woman standing in the parkway or on the sidewalk (the "Complainant") who told them that a man her daughter knew (the "Suspect") had attempted to break into her home through a window. In her initial conversation with the Officers, the Complainant described the Suspect as follows: "He just ran around the corner. . . . He's brown-skinned complected, he has curly black hair. Right now, he has on a pair of blue jogging pants with red stripes on it [sic] and a cartoon character jacket with a black hoodie up under it." (ECF No. 45-9, Defs.' Ex. I, Dash Camera Video ("DCV") at 4:09-4:25;[2] ECF No. 45-6, Defs.' Ex. F, Dep. of Stefany Solis at 34-35.) The Officers then drove around the area for two to three minutes in a fruitless search for the Suspect. (Solis Dep. at 35, 38.) It is unclear from

---

[1]  At some point after the events giving rise to this action, Rivera changed his surname to Capo. (ECF No. 45-7, Defs.' Ex. G, Dep. of James Capo at 5 ("My name is James Capo, . . . formerly known as James Rivera.").) Plaintiff has not yet sought to amend the pleadings or case caption, and defendants continue to refer to him as "Rivera," so the Court will follow defendants' lead in this regard.

[2]  The Officers' squad car was equipped with a camera on the dashboard, and the Officers also had body-worn cameras; these cameras captured video recordings of the events at issue.

the parties' presentations whether the Officers ascertained from the Complainant how far in advance of this initial conversation the attempted break-in had occurred.

The Officers returned to the Complainant and had another brief curbside conversation with her in which she told them that the Suspect "just went up the block." (DCV at 7:07-7:08.) The Officers drove around the area again for about two minutes without finding anyone matching Complainant's description of the Suspect. The Officers again returned to the Complainant, exited their squad car, and had a longer conversation with her while standing in the parkway. The Complainant gave them further details about the Suspect, including that she had his name and "exact address"; she had spoken to his mother and learned that he was 35 years old; and he was wearing "a red Atari sweater with a black hoodie up under it." (*Id.* at 9:44-14:20; ECF No. 45-11, Defs.' Ex. K, Rivera Body-Worn Camera Video ("Rivera BWC") at 0:06-4:40.) The Complainant also showed the Officers a photograph of the Suspect that she had on her cell phone.[3] During this third conversation, other police officers arrived at the scene.

Solis and Rivera returned to their squad car to look for the Suspect yet again. Solis said to the other responding police officers (who, it appears, had spotted an individual matching the description), "Where did you guys see him? We'll just follow you." (DCV at 14:19-14:22; Solis Dep. at 46.) As Solis and Rivera pulled away from the curb, the Complainant called out to them that "he just went up this block right here. He has a black hoodie on." (DCV at 15:17-15:22; Solis Dep. at 46-47.) Solis and Rivera then drove northbound on Hamlin Avenue and turned left onto Huron Street, where they saw an individual, later identified as plaintiff Kyenan Harden Morales, walking down the sidewalk in the direction of Avers Avenue. Rivera asked Solis, "Is this him right here?" Solis responded: "I think so. Right? Gray jogging pants, black pants?" (DCV at 15:36-15:44; Solis Dep. at 48-49.) Rivera stopped the car. Solis got out, radioed "he's right there" to other officers, began walking toward plaintiff, and said, "Sir?" (ECF No. 45-10, Defs.' Ex. J,

---

[3]  Plaintiff states in his Local Rule 56.1 Statement of Additional Facts that "[b]efore Defendants encountered Plaintiff, the Complainant showed Defendants Solis and [Rivera] a photo of the suspect on her cellular phone, told them his address, and that she had even spoken to the Suspect's mother." (ECF No. 53, Pl.'s L.R. 56.1 Stmt. Add'l Facts ¶ 5.) After asserting a relevance objection, which the Court overrules, defendants respond as follows in relevant part: "Defendants admit that they received information relating to the suspect from the Complainant in the underlying domestic disturbance." (ECF No. 58, Defs.' Resp. Pl.'s L.R. 56.1 Stmt. Add'l Facts ¶ 5.) But there is no dispute that the Officers received "information" from the Complainant; it is the precise nature and content of that information that is highly relevant to the issues on summary judgment. Defendants' purported admission improperly fails to address the substance of plaintiff's fact statement. Accordingly, the Court deems defendants to have admitted that the Complainant showed the Officers a photo of the Suspect. *See, e.g., Midwest Operating Eng'rs Welfare Fund v. Davis & Son Excavation, LLC*, No. 19 C 1153, 2021 WL 1192560, at *2 (N.D. Ill. Mar. 30, 2021) (evasive responses that do not fairly meet the substance of material facts asserted do not comply with LR 56.1). Furthermore, in her deposition, Solis initially stated that she did not recall whether the Complainant had shown the Officers an image of the Suspect, yet later conceded that the video recording from her body-worn camera and a statement Solis later made indicated that Complainant had done so. (Solis Dep. at 44-45, 58-60, 71-73.)

Solis Body-Worn Camera Video ("Solis BWC") at 1:58-2:08.) At that point, plaintiff took off running. Solis chased plaintiff on foot for a few blocks, and Rivera followed in the squad car. Solis, and shortly thereafter Rivera and several other officers,[4] caught up to plaintiff, who had entered the fenced-in front yard of a home at 3750 West Huron. He was attempting to climb over rain barrels to get over the side-yard fence. Solis told plaintiff to stop and tried to grab him as he went over the fence; Rivera also told plaintiff to stop, and he and another officer pulled plaintiff over the fence, tackled him, and handcuffed his hands behind his back. (Rivera BWC at 7:34-8:01.) Officer Albert Jacenik conducted a protective pat-down of the plaintiff to make sure he was not carrying weapons or contraband. The officers frisked plaintiff and went through his pockets. Plaintiff was wearing a black jacket (with no cartoon logo but with an embroidered red and white design on a portion of the front or sleeve) over a black hoodie sweatshirt with no logo, a white shirt, faded black or dark gray jeans with red writing on the back of each leg, and a black stocking hat. He had dreadlocks, not curly hair.

      When one of the officers asked plaintiff whether he had any drugs on him, he said no but that he had "a warrant." (Rivera BWC at 8:10-8:16.) Shortly thereafter, the officers brought plaintiff back on his feet, and another officer at the scene said to Solis, "That's not the guy that she saw. That's not him at all. . . . That's not the Atari guy at all." (Solis BWC at 4:10-4:23.) Solis then asked plaintiff why he ran, and plaintiff replied that he had "two warrants." (Solis BWC at 4:28-4:32.) The other officer reiterated that "[t]his is not the domestic guy," and Solis replied, "okay, well, he got warrants, so." (Solis BWC at 4:47-4:53.) Plaintiff did not actually have any active or outstanding arrest warrants, but it is unclear from the parties' submissions when the officers determined this fact. Solis also remarked, "[T]hat doesn't even look—if you would've seen the picture . . ." (Solis BWC at 5:04-5:08.)

      Plaintiff, still handcuffed, was taken to a nearby squad car and placed in the back seat. Meanwhile, he called out to a bystander nearby. Jacenik thought that he heard plaintiff say, "Hey shorty, hey bang bang," and ask the bystander to go to his house on Avers and tell his girlfriend what had happened. (ECF No. 45-8, Defs.' Ex. H, Dep. of Albert Jacenik at 34-36.) Plaintiff maintains that he did not say "bang bang" but rather "Backpack," the nickname of the bystander, who was an acquaintance. (ECF No. 52, Pl.'s Resp. Defs.' L.R. 56.1 Stmt. ¶ 37.) One of the officers told plaintiff, "You'll get your phone call." (Rivera BWC at 9:13-9:27.) In the meantime, further conversation ensued among the officers about plaintiff's not being the "offender," and a decision was made to take plaintiff to the Complainant for a "show up" to confirm that he was not the Suspect. When Solis and Rivera got back into the squad car with plaintiff, Solis again asked plaintiff again why he ran, and he replied that he did not want to go to jail. Solis also asked plaintiff for his name, and plaintiff replied, "Kyenan Harden Morales." (DCV at 20:05-20:14.)

      After plaintiff was placed in the squad car, Jacenik began looking around the scene for a gun. (ECF No. 45-12, Jacenik Body-Worn Camera Video ("Jacenik BWC") at 4:10-4:15.) Although none of the officers had seen plaintiff possess or drop a gun and none had mentioned a gun, Jacenik suspected that plaintiff might have had one because he had said "bang, bang" to the bystander and fled yet freely admitted to having warrants after being detained, and Jacenik had

---

[4]     Plaintiff originally sued eight officers, but the parties later stipulated to dismiss with prejudice all individual defendants except Solis and Rivera. (ECF No. 35.)

3

experience with individuals attempting to throw or conceal items from police during a foot pursuit. (Jacenik Dep. at 18, 54.) After a couple minutes of searching, Jacenik found a handgun in the front yard of 3750 West Huron behind one of the rain barrels that plaintiff had been climbing on. (Jacenik BWC at 6:42-6:50.) By this time, Solis and Rivera had ascertained from the Complainant that plaintiff was not the Suspect, but they had not released plaintiff. One of the officers at the scene radioed Solis and Rivera that they had recovered a gun, so plaintiff was taken to the police station, where Solis read him his *Miranda* rights and told him that he was being charged with gun possession. Plaintiff, who had three prior felony convictions at the time and did not have a firearm owner's identification card or concealed-carry permit, was charged with two felony counts of possession of a firearm and two felony counts of aggravated unlawful use of a weapon by a felon. He was held in custody at the Cook County Jail for over a year—until February 9, 2021, when the State voluntarily dismissed the case. Plaintiff denies that he possessed a gun or put a gun behind the rain barrels on November 21, 2019.

On July 30, 2021, plaintiff filed this action. His complaint contains three claims: a § 1983 claim against the Officers for unreasonable seizure (Count I); a § 1983 claim against Solis for unreasonable pretrial detention (Count II); and a state-law malicious prosecution claim against Solis and the City of Chicago (Count III). Plaintiff alleges that the Officers had no probable cause to seize and detain him or to believe that he possessed a firearm. He further alleges that Solis misled prosecutors by falsely reporting that plaintiff fit the description given by the Complainant and falsely claiming that she saw plaintiff place an object on the ground by the rain barrels, thus causing plaintiff's wrongful detention and prosecution.

Defendants move for summary judgment on each claim.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019). The Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmovant. *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmovant's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could reasonably find in his favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

Defendants argue in their opening memorandum that the existence of probable cause for plaintiff's arrest, detention, and prosecution dooms each of plaintiff's claims (and alternatively

that the existence of arguable probable cause warrants qualified immunity). They reason as follows: "Initially, Officers had probable cause to believe Plaintiff was the Suspect for the Call. Once the Complainant advised that Plaintiff was not the Suspect, the continued seizure of Plaintiff was supported by probable cause because a firearm was located in the location where Plaintiff was caught and after Plaintiff had yelled to a bystander 'bang, bang.' Thus, the probable cause shifted from that established by the Complainant during the Call to the location and recovery of the firearm to support Plaintiff's arrest, detention, and prosecution for unlawful possession of the firearm." (ECF No. 44, Defs.' Mem. Supp. Mot. Summ. J. at 8 (citations omitted).)

The existence of probable cause depends on the elements of the predicate criminal offense as defined by state law. *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 715 (7th Cir. 2013). As plaintiff points out, defendants fail to develop a coherent argument in their opening memorandum as to what particular crime the Officers had probable cause to believe plaintiff violated at what time. In their reply brief, defendants contend that the Officers had probable cause to arrest plaintiff for "possession/use of a firearm." (ECF No. 59, Defs.' Reply at 1.) Defendants clarify that their position is that "[p]laintiff was placed into custody as a possible suspect for the underlying complaint, but he was not arrested until after the weapon was found." (*Id.* at 4.) Defendants do not elaborate or attempt to explain why the Court could reasonably conclude on this record that plaintiff was not arrested upon being tackled, handcuffed, searched, and put in the back of a squad car. Nor do they present any argument that the act of "plac[ing]" plaintiff "into custody" constituted an investigatory *Terry* stop justified by reasonable suspicion. Defendants also fail to address the independent conclusion the officers reached almost immediately after detaining plaintiff that he was not the Suspect. Defendants' analysis is muddled because it glosses over the nature of the initial seizure and the officers' knowledge at the time. As Judge Tharp observed in a case involving a similar issue and argument:

> The defendants' primary argument with regard to the arrest is that because a gun was found in the van, and Hudson is a felon, the officers must have had probable cause at all times during their encounter to arrest him for being a felon in possession of a weapon. This argument fails because an officer's later knowledge is not attributed retroactively. All that matters for determining whether the officers had probable cause is what the officers knew when they arrested Hudson. Hudson was arrested when "a reasonable person in [Hudson's] position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." [*Abbott*, 705 F.3d at 719]. For example, an application of physical force is sufficient for a person to be seized under the meaning of the Fourth Amendment. *Cal. v. Hodari D.*, 499 U.S. 621, 624 (1991). There is, at the very least, a dispute of material fact as to when Hudson was arrested.

*Hudson v. City of Chi.*, No. 14 C 6267, 2017 WL 2958085, at *2-3 (N.D. Ill. July 10, 2017) (citation omitted); *see also Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000) ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information."); *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) ("Even in an area of law with few hard and fast rules, . . . the use of certain police restraint techniques such as using handcuffs, placing suspects in police cars, . . . and other measures of force

5

more traditionally associated with arrests, may become so intrusive as to become tantamount to an arrest requiring probable cause.") (internal punctuation and citations omitted).

Because defendants skirt the issue of when plaintiff's arrest occurred and present no *Terry* stop argument so that the Court can properly analyze the legal justification for plaintiff's initial detention, and it is defendants as movants who bear the burden of informing the court why a trial is not necessary, the Court denies defendants' motion as to plaintiff's initial detention. Whether the initial detention was an arrest and whether it was justified will be questions for a jury. This conclusion, however, does not get plaintiff very far because of the events that occurred shortly after his detention, which established probable cause to arrest him for possession of a firearm.

"Probable cause to arrest exists when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (internal punctuation and citation omitted). This is a commonsense inquiry that requires only a probability of criminal activity. *Id.* Applying this standard, plaintiff's behavior and the surrounding circumstances provided probable cause to believe he unlawfully possessed a gun. The facts material to this inquiry are undisputed. When Solis approached plaintiff and merely said, "sir," plaintiff immediately began running from her. When plaintiff was seized, he volunteered that he had a warrant and shortly thereafter stated that he had two warrants, which the Officers discovered did not exist. Jacenik heard plaintiff say "bang, bang" to the bystander.[5] Five minutes later, Jacenik found a gun behind the same rain barrel that plaintiff was climbing over to get out of the yard he had entered.[6] These circumstances led to the Officers' objectively reasonable belief that plaintiff, a felon, had possessed the gun that was found behind the rain barrel. For the same reasons, the Officers would be entitled to qualified immunity; even if they did not have probable cause, the Court would conclude that they had *arguable* probable cause. *See generally Cibulka v. City of*

---

[5] Plaintiff disputes that he said "bang, bang" and claims that he said "Backpack," the bystander's nickname. Jacenik testified at his deposition that he believed that the words were "bang, bang" and that the remark was one of the reasons he searched for a gun at the scene. As defendants point out, it matters not whether Jacenik's impression was correct as long as his belief was reasonable. *See, e.g.*, *Doxtator v. O'Brien*, 540 F. Supp. 3d 815, 830 (E.D. Wis. 2021) ("A mistaken understanding of the facts that is reasonable under the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment."), *aff'd*, 39 F.4th 852 (7th Cir. 2022). The Court's review of the body-worn-camera video footage reveals that while reasonable minds could differ on what plaintiff actually said, one possible rational conclusion is that plaintiff indeed used the words "bang, bang" when asking his acquaintance to tell his girlfriend what had happened.

[6] The Court also notes from its review of the video footage that plaintiff's detour into the residential yard made little sense if he were simply fleeing and not looking to stash a weapon. The rain barrel behind which the gun was found was situated behind a railing that was situated behind a fence that enclosed the entire front yard. Instead of taking a route with no obstacles, plaintiff entered the yard, cornering himself and creating a situation where he had to scale a fence to continue flight.

*Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (an officer is entitled to qualified immunity in a false-arrest case when a reasonable officer could have believed that probable cause for arrest existed).

Plaintiff maintains that there was no probable cause to believe that he possessed the gun because defendants admit that none of the responding officers actually saw plaintiff with a gun or saw him drop or place an item behind the rain barrel, and there was no probable cause to believe he had "constructive possession" of a weapon. These arguments are unpersuasive. To establish constructive possession under Illinois law, the State need not prove that the defendant physically possessed contraband, but rather that the defendant had knowledge of its presence and exercised immediate and exclusive control over the area where the contraband was found. *People v. Maldonado*, 35 N.E.3d 1218, 1223 (Ill. App. Ct. 2015). The theory of constructive possession, however, is a red herring because given all of the circumstances discussed above, including plaintiff's flight and the timing and location of the discovery of the gun, the Officers had probable cause to believe that plaintiff had had *actual* possession—physical control—of the gun that was recovered behind the rain barrel. Actual possession, like probable cause, can be based on circumstantial evidence. *People v. White*, No. 2-21-0262, 2022 WL 2230859, at *7-11 (Ill. App. Ct. June 21, 2022) (affirming conviction for unlawful possession of a weapon by a felon based on circumstantial evidence of actual possession, where defendant fled from police through a residential neighborhood and a gun was later found near where defendant was seen scaling a fence into an adjoining yard); *People v. Simmons*, No. 4-21-0700, 2022 WL 2305762, at *7 (Ill. App. Ct. June 27, 2022) (actual possession of a weapon can be proved with circumstantial evidence); *United States v. Lewis*, 397 F. App'x 226, 227 (7th Cir. 2010) (holding that there was sufficient evidence of actual possession given the circumstances, including flight from police, even though no witness actually saw the defendant with a gun, and observing that common sense can be used in making reasonable inferences from circumstantial evidence and circumstantial evidence is no less probative of guilt than direct evidence); *United States v. Curse*, No. 17 CR 382, 2019 WL 918504, at *2 (N.D. Ill. Feb. 25, 2019) (concluding that officers had probable cause for arrest even though the officers themselves did not witness a drug transaction, and noting that probable cause can be based on circumstantial evidence) (citing cases).

Accordingly, because the ensuing events established probable cause to arrest plaintiff for the gun offenses with which he was charged, plaintiff's claim for an unreasonable seizure may proceed only to the extent that plaintiff seeks damages (which are likely nominal) for the period that he was seized prior to the discovery of the gun. *See Martin v. Marinez*, 934 F.3d 594, 599 (7th Cir. 2019) ("[T]he exclusionary rule does not apply in a civil suit under § 1983 against police officers."); *Torres v. City of Chi.*, No. 18 C 2603, 2021 WL 392703, at *10-11 (N.D. Ill. Feb. 4, 2021) (holding that plaintiff's § 1983 claim for unreasonable seizure could proceed, but was limited to damages for the period that he was in handcuffs prior to the officers' discovery of contraband); *Martin v. City of Chi.*, No. 15 C 4576, 2017 WL 56633, at *4-5 (N.D. Ill. Jan. 5, 2017) (holding that, while the plaintiff may have been entitled to nominal damages resulting from a Fourth Amendment violation related to his initial stop and search, there was probable cause to arrest him once contraband was discovered, and "[t]he lack of probable cause to stop and search does not vitiate the probable cause to arrest, because . . . the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant") (internal punctuation omitted) (citing cases). Furthermore, the existence of probable cause for plaintiff's arrest following the discovery of the gun defeats any claim for compensatory damages for that arrest and subsequent detention and

7

prosecution, so summary judgment for defendants on Counts II and III, plaintiff's claims for unreasonable pretrial detention and malicious prosecution, is appropriate.[7] *See Marinez*, 934 F.3d at 599 ("[I]t bears noting that the existence of probable cause for the arrest would also bar recovery on a theory of malicious prosecution."); *Torres*, 2021 WL 392703, at *10-11 ("[E]ven if the evidence providing probable cause was the fruit of a warrantless entry and search without Plaintiff's consent, probable cause still insulates Defendants from liability [under § 1983 for damages following the discovery of contraband]. . . . Plaintiff may not recover damages for the 371 days he spent in jail awaiting trial."); *Martin*, 2017 WL 56633, at *6 (concluding that plaintiff could not recover for his 65-day incarceration before the charges against him were dropped). Given this conclusion, the Court need not address defendants' additional arguments for summary judgment on Counts II and III.

## CONCLUSION

Defendants' motion for summary judgment [43] is granted in part and denied in part. As to Count I, plaintiff's claim for unreasonable seizure against the individual defendants, defendants' motion is granted in part and denied in part. Count I survives this motion, but only with respect to the period during which plaintiff was seized prior to officers' discovery of the firearm. Defendants' motion is granted as to Counts II and III, plaintiff's claims for unreasonable pretrial detention and malicious prosecution. Because Count III is the only claim asserted against the City of Chicago, the City is terminated as a defendant.

A status hearing is set for February 9, 2023, at 10:30 a.m. to discuss the next steps in this litigation. The hearing will be in person.

**DATE:** January 31, 2023

**Hon. Ronald A. Guzmán**
**United States District Judge**

---

[7] For purposes of plaintiff's malicious-prosecution claim in Count III, the fact that Solis is not liable forecloses municipal liability under Illinois law. *See McWilliams v. City of Chi.*, No. 20-1770, 2022 WL 135428, at *3 (7th Cir. Jan. 14, 2022) (citing 745 ILCS 10/2-109).

8